Case number 20-1025 et al. Environmental Health Trust et al. Petitioners versus Federal Communications Commission and United States of America. Mr. McCullough for the petitioners, Ms. Boiesel for the respondents. Mr. McCullough, good morning. Please proceed. Good morning. May it please the court. I'm W. Scott McCullough presenting argument on behalf of the 14 petitioners in these consolidated cases. One of the petitioners recently contacted the FCC to seek redress for injuries she attributes to RF exposures. The commission representative said, we don't deal with humans, only frequencies, and hung up. That conversation encapsulates the FCC's approach here. By closing the inquiry, the commission failed its duty under the Communications Act to consider all potential health and safety impacts of radiofrequency emissions on humans. It ignored over 1,000 peer-reviewed studies showing that exposure to non-thermal radiation at authorized levels evokes a clear biological response beyond mere tissue, and it leads to multiple forms of harm. It ignored direct human evidence of current injuries. It failed to comply with the APA and NEPA for similar reasons. The commission has a substantive duty under the Act to have and maintain adequate emission limits. Can I ask you a question about standard of review? You say that we shouldn't give the commission any heightened deference in this case, citing Fox television among other cases, but can you point me to any instance where we or the Supreme Court have not given heightened deference to an agency decision involving scientific judgments? Well, there are various levels of discretion that are given to agencies depending on the circumstances. This court and the Supreme Court has ruled that in the context of a petition for rulemaking, there is very high discretion. The problem here is this was not a petition for rulemaking. Indeed, if you look at what happened in the inquiry, the commission did engage in requirements. It extended its 1996 rules to situations, usage, and indeed even frequencies that were not covered by those. So it was functionally engaging in rulemaking here, and that's the level of deference that should be applied. But even under the highest level of deference, the commission still has to engage in reasoned decision-making. It still has to material comments. It has to look at the entire record. That sounds a lot like the standard from if we were reviewing after notice and comment rulemaking, whether they had sufficiently explained their final position and responded to substantial comments and concerns and addressed the record as a whole. What I'm struggling with is we're not at that stage. We're at the should they engage in rulemaking at all, and I understand your arguments about things that they didn't respond to with much of any sufficiency, but I'm searching for case law precedent that says in this context how much they have to say about contrary evidence in the record. Well, you know, my first point is that regardless, even if you are giving them the highest deference that is given under any circumstances, which we think they were engaging in rulemaking here. Okay, but let's assume I don't. Let's assume this for these purposes. Look at our, we have a body of case law on petitions for rulemaking and how inaction or denial of those is treated. So within that body of case law, can you explain to me what our rule would be that they violated here? This was not a petition for rulemaking. This was a proceeding. I understand by the commission. And it was very much like in the Fox case, a notice of inquiry. And you know, in that case, this court did not give the highest level of deference. But no matter how much deference you give them, the problem here is you just simply cannot say that the six paragraphs the commission dedicated to addressing the inquiry can adequately deal with all of the evidence in this case. It did not mention all of the 1,000 peer-reviewed studies. It gave scant mention to only three items, the Razmini, the NTP, and the Bionitiative. And the ones you sort of rely on most heavily, right? Well, we rely on those, but we also very much rely on the underlying science and the studies that were used. They don't have to address every submission. Can we agree on that? They do not have to address every submission. They have to address every material submission. Is that true in this state? Where have we said at this stage, as opposed to, again, at the end of notice and comment rulemaking, that they have to respond to every material submission? We are not contending that the commission had to go by every single one of the 1,000 peer-reviewed studies. You just said to me every material one. So now I'm asking you, where have we said that at this stage? I think the FOX case, I apologize. I think the FOX case stands for that proposition. But no matter what scale of discretion- And what, can you tell me which page on the FOX case you're relying on? I'm sorry. I didn't mean to hold you up. Well, and I do apologize. Of course, the court addresses all of these things throughout the entire FOX case. Right. If there's a particular language or page you want us to focus on, maybe you can just tell us at rebuttal. I don't want to hold up your argument here. I'm sorry. I thought maybe you had something in particular in mind. Well, I'll be happy to supply a post-submission on this. But the real and fundamental point here is that the commission does owe some duty, substantively. It recognized that it had a duty when it opened the inquiry to give a full examination and explain its rationale and assure the public. In order to do that, it had to give some analysis to the evidence in this case. It did not mention a single one of these other studies. All that it did was mention the bioinitiative report and then dismiss it because it did not solve the problem of being able to also still which there are adverse impacts from exposure. Can we talk about the role of the FDA here? Because the order said that no expert health agency expressed concern about the conditions, radio frequency exposure limits, and that the FDA said no changes were warranted, and that is something that the FCC also argues in their brief. So, what was wrong with the FCC relying on the FDA in this case? It is permissible for an agency with jurisdiction to rely on agencies with expertise. But as was the case in the city of Boston, the city of Boston case, the agency with jurisdiction, when it looks to the agency with expertise, what that does is require the agency to expertise with expertise to itself explain its rationale and how it went about this. If you will find a magnificent difference. The problem also is the FDA was concerned, its letters, its short missives here looked only at cancer and only with cell phones. It did not look at all of the other adverse effects that the evidence shows occur here beyond just cancer. Finally, I do need to point out that the FDA is not necessarily the agency with expertise. The NTP study was contracted by the FDA. It looked to another agency within the Department of Health and Human Services, the NTP. Presumably, that is the agency with expertise. And so, I think if you want to find the agency with expertise here, it would be the NTP. I will point out that the NIEHS, yet another DHHS agency, conducted a peer review of the NTP study in which the criticisms, as short as they were, by the FDA were considered. And that peer review conducted by the NIHCS, another sister agency, rejected the FDA's concerns and, in fact, elevated some of the things that were found in the NTP study. So, you know- Can I ask on the, so the agency, the FCC, sorry, the FCC here relied heavily on the FDA and its analysis because of their medical expertise. Have you ever had an opportunity, did you have an opportunity, is there any procedure by which you could either challenge the FDA or go to the FDA and prompt them to look at your medical evidence and change their position? It seems this is a very odd statute in that they have the technological role, but they don't have the medical knowledge, and you're asserting injuries that are medical injuries, physical injuries to bodies, in which the FDA seems to have more expertise. It just, it almost seems like we're, the one you should be talking to is the FDA. Have you talked to FDA? Have they, have you had given submissions to them? Did they look at these types of reports? There is no information in the agency record here on that point. There were, there are, there is information in the record where people near the end of this proceeding responded to what the FDA director said. But we do have a fascinating jurisdictional situation here. There is no direct way to challenge the FDA determination. But since the commission was relying so heavily on the FDA, I think what that means is you now need to look at the FDA letter and see what it addressed and whether the FDA letter reflects some kind of reasoned decision making. And we submit it does not. It is just as cursory as the FCC's six paragraphs here. As I read the, I read the FDA submission. It was focused exclusively on cell phones and didn't address other. It was, it was, it was exclusively on cell phones and again, exclusively on cancer. It did not address some of the other NTP findings on other adverse biological effects. And I do need to point out that the commission's representation that all of the other sister agencies either did not object or agree. It is just belied by the record. The interior department has expressed concerns. The EPA has expressed concerns with the thermal only approach. Obviously the NIHS doesn't agree. We have the access board findings. We have the CDC recognition of radiation sickness as a disease. It is just simply not correct to say that the federal government and all of its agencies is entirely aligned on this question. But no one has proposed any specific change in standard, right? And you can't point to any international standard that is stricter or more restrictive than the U.S. standard. There are. Am I correct on both of those statements? There are some more restrictive standards and there are some more all-encompassing standards. What more restrictive standards did you cite in the brief? Well, for example, I can certainly cite to the commission order itself, although it is not in the notice of inquiry. As the commission notes in paragraphs 122 through paragraphs 124, when it comes to some of the frequencies that the commission applied its regulations to, which were not in fact covered by the 1996 ones, specifically under 100 kilohertz and over 100 gigahertz, some of the international standards are more restrictive, especially at the lower end of the band than the commission's are here. If you take a look at, for example, and you may not have it in front of you, but note 328, when they're talking about neurostimulant responses to low frequency emissions below 100 kilohertz, the commission actually recognizes the very symptoms that we recite for what we call radiation sickness and the international organizations that made special provision for that. In the part of the notice of proposed rulemaking, the commission proposes to make some but it did not do so here in the notice of inquiry. At present, under the rules, the purposes of these regulations and these frequencies where the commission had not heretofore applied its rules in 1996, these rules now apply as a result of the notice of inquiry. The commission did indeed extend its 1996 rules to activities, frequencies, technologies that were not addressed in the 1996 orders. And that is why we say this was functionally, although not in name, a rulemaking. It made new rules for all of these new things that were not contemplated in 1996. I understand that argument, but what the FCC says is that basically in all of the comments, there's a lot of sound and fury, but there's no specific recommendation other than one, I guess, from the bio initiative report that says set the limits, you know, a million times more restrictive or a billion times more restrictive. And they say that the technology can't work if those levels are that low. I didn't see any rebuttal to that point. And the only rebuttal I saw in your brief and the reply was, well, the bio initiative report suggested a path forward. Well, when I read that report, the path forward I see is, well, there needs to be more study done, but there's no specific regulatory kind of limit change that it proposes. So do you disagree with anything that I've said there? And if not, why isn't that an undermining your position? I see that I'm somewhat over my opening time. May I still go ahead? Of course, go ahead. The first step to solving the problem is recognizing that there is one. And the bio initiatives main point was there are these significant aspects of the problem that the thermal-based rules do not address. And that is that there are biological responses that occur. There's biological responses, many of which are adverse when you are exposed to authorized emissions. The bio initiative said, based on its analysis of the studies, here is the point at which there is a response. The bio initiative was not necessarily recommended that emission limits be taken immediately all the way down to the point where there is a biological response. Their main point was you need to adjust your rules so that are biologically based, not thermal based. It then recommended collaboration between the scientists who understand biological responses, the commission, and those who design networks to try to find the point where you could have services with less harm. And so the bio initiative was not saying take limits down all the way to this level. It was saying recognize there is a biological response and let's find a way to adjust standards so that we lessen the harm while still maintaining the ability to provide service. How does that translate into error by the commission here? It does because what the commission demanded in the inquiry and in the order, it said, we're not going to pay attention to your science unless you also solve the service utility problem. And the entire point is there's two problems. The problem is the biological response. And then you have to figure out a way to address that within the context of being able to still provide service. This was a notice of inquiry. Or at least it was supposed to be. In the actual rulemaking would be the time to find the actual emission levels that would serve both needs. And so the commission just completely misconstrued and misapplied what the bio initiative was saying. They were not saying take it down to this level. Okay. Can I interrupt you for a second? Because there's something that I thought was very interesting about the briefing here that I'm brief. They refer to 21 USC section 360 II. And as part of their argument that the FDA is really the kind of expert agency on human health impact of radiation of this sort. And that particular statute references says that the FDA is supposed to kind of get this advice and expertise from a technical electronic product radiation safety standards committee which is created a couple of sections later in 360 KK sub paragraph F. And that committee is supposed to have, you know, of diverse representation of people from industry and scientists and medical professionals, et cetera, et cetera, to basically kind of do what you're saying that should, you know, undertake the sort of analysis that you say should be done. Interesting to me, though, that you don't reference this committee at all in your briefing. It's also significant to me that the FCC doesn't reference that technical electronic product radiation safety standards committee in their briefing, even though that committee is supposed to take the lead on testing things like cell phones and the testing standards and the standards that they're supposed to meet. Why is it that you don't seem to think that this statute has any relevance or at least you don't talk about it in your briefing? We do not talk about that in our briefing because it has no relevance. The FDA's jurisdiction over some radiation-emitted devices is far more limited than that. And while it is true that the FDA itself would have jurisdiction to establish rules upon proper petition, that would be the secretary of the FDA, not necessarily the division that handles these matters that Dr. Shuren is with. And so we have not only a procedural and jurisdictional problem, there's also just nobody seems to have invoked or sought a rulemaking from the FDA that would have set in process the committees and such like that are described in the statute you cite. We are dealing with the... Does that committee exist or not? I beg your pardon? Does that FDA committee exist or not? There is no evidence in the record on that as far as I know. Do you just know whether it exists? I do not know. I apologize. Remember, in this context, and looking at it from more or less a NEPA perspective, the commission is trying to rely on the FDA as an agency with expertise, where the commission is the agency with jurisdiction. And the problem is the FDA is not necessarily properly considered an not the environment. And so, you know, I truly do think that the commission needed to look to far more than and rely on far more than a couple of letters from an FDA director. And once you look at those letters to begin with, they simply do not pass any kind of muster for reason decision making, if this is what the entire case turns on. It does not at all compare to what this court approved in the city of Boston case to again, cite that example. All right. If there are no more questions, then we'll give you some time and reply. We'll hear from Ms. Boiesel. Good morning, may it please the court. Ashley Boiesel for the Federal Communications Commission. As I think the panel recognizes, the FCC was not writing on a blank slate in this case. Instead, it was seeking scientific evidence and recommendations on the effectiveness of radio frequency emission limits that it adopted in 1996, and that have been upheld against judicial challenge twice before. As both this court and the Second Circuit have approved in making this evaluation, the FCC reasonably relied on the views of federal agencies with primary jurisdiction in public health, as well as recognized standards bodies. The FCC relied on substantial evidence. I mean, I guess I should back up. Do you know whether this committee that Judge Wilkins referenced within the FDA even exists and whether it has spoken on this issue? I'm not familiar with the committee or what its status is. So in the notice of inquiry, the FCC flagged that it wanted to get input, including from these expert federal agencies, sister agencies, information on what had changed since 1996, and that is the ubiquity of the devices, the different types of devices, the sheer volume of them, and intervening developments in analysis of medical consequences in both the introduction and then even in your final decision here in your second report in order, there's lots of discussion about how there's so many new devices, and people are using multiple devices. Way more people are using them, and way more people are using them all the time or through extensive periods. This was even before the pandemic when we're now living on this stuff. But even before that, the amount of usage, the number of devices used often simultaneously, the age range of people who are using these and how long they're using them, that was all quite sensibly what the FCC asked for. The FDA came back and talked about cell phones and cancer. How was it reasonable for the FCC to rely so heavily on a response from the FDA that there's no indication relied on this specialized committee and did not address the very things you asked for information on, other devices, the use of multiple devices, and physical harms other than cancer? How was that reasonable, even with the super deference you get at this stage? Well, first of all, we didn't rely exclusively on the FDA's representations about the state of the science. You're right that their I think it was said about cell phones, but that just simply didn't answer the question asked. So how was it reasonable to rely on it? I don't want to hear, I just want to know how it was reasonable to rely on something that was not responsive to the inquiry. Sure, for two reasons. One, cell phones are used in close proximity to the body, and the power of an emission decreases exponentially with distance. So cell phones are the device that is creating the most radio frequency emission when compared to other devices and other base facilities. Second, we have aggregate limits that apply to fixed facilities. Those are set forth at 1.1307b3, and they require that all fixed facilities. I'm talking about watches, I'm talking about iPads. Okay, those are not fixed facilities. Sure. And then I'm also talking about just using a phone and holding it up to your ear. People don't use their phones, hardly use them for phone calls anymore. They're constantly in the hand, not two centimeters away, they're constantly in the hand, and the fingers are constantly on them. And so I'm just trying to understand how the FDA coming back and talking about cell phones that are in a holster, or nobody keeps them anymore, or in a purse, or they're not being used. Is it all right? And looking only at cancer, is it all relevant to inquiry, again, into the effect of this radiation frequency from multiple devices that are used in entirely different ways now, an entirely different volume, and throughout the population, including children who live on iPads. So as I said, the FDA said in its letter at J8187, that it was engaged in an ongoing review of the evidence in this area. And then as you say, it represented a specific conclusion with respect to the National Toxicology Program's research on cell phones. But that was coupled with representations in our termination of the notice of inquiry at J8187, that the World Health Organization had found no substantiated adverse effects from fixed facilities. So this wasn't an inquiry that was limited narrowly. I'm sorry, you are way more expert than me. Is an iPad a fixed facility? No, an iPad is not a fixed facility. Is a watch a fixed facility? No, right. Okay. Is a wireless laptop a fixed facility? No, but when I talked about when the notice of inquiry talked about the ubiquitous use of devices, was it talking about fixed facilities? No, not exclusively, but I was going to. No, no, no, but I don't think that was, okay, I get that, but I just say. I apologize for not being responsive. The fixed facility stuff, I don't, to me at least, doesn't feel responsive unless I'm misunderstanding it. I'm really curious about all these other devices. Absolutely. So with respect to mobile and portable devices, we said at paragraph 143 of the notice of inquiry and paragraph 67 of the order on review here, that there didn't need to be aggregate limits, that we didn't have a concern about the aggregate effect of transmissions from these mobile and portable devices because they tend to be used. Sorry, I'm sorry. It's okay. It's 67. I'm sorry, are you talking about JA 67 or 67? It's paragraph 67. Sorry. It's JA 35 to 36. Okay. So we explained in that paragraph that exposure from mobile and portable devices tends to be a more localized exposure when they're held close to the body. That would cover things like a watch or a tablet held in the hand or a cell phone, and that exposure, because it's more localized, doesn't need to be aggregated because the whole body exposure is much more diffuse. So we addressed the fact that- What other expert agency was the one that addressed that for you? We were making that judgment in our own technical expertise, that the effect of these emissions was not significant in the aggregate and that therefore there didn't need to be any kind of aggregate limit. But with respect to our reliance that- Pardon me? How did you decide? I mean, these things are strapped onto the arms and in the hands, significant part of the day. How was it that you decided that that was not a significant change from what you had looked at in 1996? Well, there are no substantial adverse effects from exposures at the existing levels. So the fact that they're strapped on the wrist- And how did you find that? Was this through your 2.5 centimeter test? Well, no. What I'm doing is referring to our explanation of why the existing limits continue to be sufficient. And what we said in terminating the notice of inquiry is that the scientific evidence, and we relied on the FDA, but we also referred to other expert organizations and bodies, that the scientific consensus had not changed. And I think it's a mistake to characterize what did as relying exclusively on the FDA's conclusions, because that's not what we did here. We also looked to the views of, as I said, the World Health Organization at JA-12, the International Commission on Non-Ionizing Radiation Protection, the National Toxicology Program scientists themselves said, don't rely on this rat study and extrapolate to humans. So it was a broader inquiry and we engaged more broadly with the experts in this area in drawing the conclusion that there were no substantiated adverse effects. And your question- I see what you're talking, in some paragraphs section you say that people worry about cumulative ones, exposure from fixed RF sources will vary, but we're not talking about fixed RF sources. And so where do you say for non-fixed ones? I'm sorry, I'm not reading the paragraph, maybe the way, I'm not reading it with your expertise. I'm missing something. Where are you talking about non-fixed in paragraph 67? We say that the location, let's see, sorry. When the RF sources are close to the body, they will be exposing smaller areas of the body at the end of that paragraph. And separated sources will accordingly expose different areas of the body without overlap. If you keep reading, so 67 leads into paragraph 68. We note that the exposure from each portable or mobile device near a person will generally involve low total power absorption while being highly localized and will not result in significant contributions to whole body average. And what are you citing for that conclusion? I don't see any authority cited or any study or any base, any explanation of how you came to that conclusion other than that just conclusory statement. You're correct. Well, you're correct. How did we decide that the localized exposure didn't, would be absorbed in our multiple localized exposures for prolonged periods of time? How that would not be harmful? Yeah, how did you decide that? Well, again, I think you have to link the observations here with the observations we You're correct. There is no footnote here, but if you go back to the resolution terminating the notice of inquiry, we said repeatedly that there was no evidence of any effect, not just cancer, any illness from radio frequency emissions below our existing levels. And in fact, we said at, below at, and sometimes even above our existing. And that one said, sorry, can you point me to that paragraph where it said, where it was addressing cumulative impacts? Okay. Again, I apologize if I'm not being responsive to your question, but the cumulative effects are addressed here. In addition to referring back to findings that were not themselves cumulative. No, the scientific conclusions here are cumulative. They, the science, the scientific studies that the FDA and others have, have looked at. And the FDA didn't, the FDA was only talking about cell phones. That's my point. That's fine. There could well be, it's a very big record, better than me. There could very well be something where it was clear that you were relying on either your own determinations rather than just conclusions or, or there's another, a FDA somewhere else or another agency talked about cumulative exposures from multiple devices over a prolonged period of time for physical impacts other than that was made at the beginning. Cumulative. I don't know that, that we used the word cumulative in terminating the notice of inquiry, but the, the statements that we made meant paragraph. Are you talking about, did the FDA ever talk about anything other than the cell phones? Um, and it's public statements. It makes, it makes broader statements about the science. Um, I don't know what you're talking about cell phones. That was the only science that backed up, had to back it up. Right. I think that most of the FDA statements were about cell phones, but again, those were supplemented by representations by other, um, entities, what are the state of the science? Again, the world health organization, the international commission for non-ionizing radiation protection, which also, um, pardon me. And they, and they talk specifically about cumulative exposure from the use of multiple devices, um, for prolonged periods of time, as you've noticed, this was the whole reason you had these changes and they talked about those specifically. Um, the studies that were conducted or the scientific conclusions reflect the conclusion that even the cumulative effects are not harmful to human health. They're mobile devices. There's wireless devices, not a fixed devices. Yes, because the only substantiated harm is a thermal harm at this point in time. And, and what we know is that at four Watts per kilogram, we start to observe changes. Um, there are, there are no substantiated adverse effects below that level. And as it is, our standards incorporate a substantial safety margin. There are 50 times, um, safer than that four Watts per kilogram for thermal effects, but non-thermal not looking for non-thermal effects. Right. We're not, the limits address both kinds of effects because the only substantiated adverse effects are thermal ones. And, and we acknowledged evidence on the other side. We acknowledge that much of the record was not scientific that which supported to constitute research evidence lacked any persuasive cases to its value or significance. Um, we acknowledged three of the four major studies that petitioners rely on in their brief, um, and explained why they didn't provide any basis to reevaluate our limits. Um, and, and again, going back to, um, the panel's questions at the start of, uh, opposing council's presentation, the standard of review is quite high here. Um, this is not the kind of case that presents the rarest or most compelling of circumstances in which reversal is required. We, we based our decision on substantial evidence as the second circuit and cellular phone task force and this court in EMR network held, um, it was reasonable for us to rely on. Can I explain my problem? I'm just going to be very upfront with why I am inclined to rule against you. So I want you to, to, to tell me why, um, I shouldn't have the concern that I do. So I misstated earlier when I said, um, you referenced on page 37 of your brief, um, 21 USC three 60 I I it was page 23 of your brief. And you say that Congress directed the FDA to establish an electronic product radiation control program designed to protect the public health and safety from electronic product radiation. The statute that you cite there is section, you know, it's 21 USC section three 60 I I when I read that, it says that cross-reference to three 60 K K will be established that will review these standards for testing any missions level. Okay. But you don't reference that committee anywhere. And I don't see anything about that committee mentioned in the administrative record. Okay. Then later on in your brief at page 37, you say not to worry because the FCC stands ready to consider changing exposure limits and inappropriate circumstances. And you refer to a radio frequency interagency working group that maintains the continuing dialogue between the FCC and the in a letter. Um, or you say that it's referred to in a letter, but when I read that letter, I don't see any, um, mention of that working group. And, um, and I don't see anything in the record that says that that working group actually, um, exists or looked at any of the evidence in this case. So the problem that I have is that you say that you're relying on the expertise of the FDA, but the entity that Congress specifically said to review this, this committee, you've given us no evidence that this committee has looked at any of this. And then you say that in the future, to the extent, anything needs to be looked at, it's going to be looked at by this working group, but I don't see any evidence that the working group looked at anything this time. So why shouldn't I send it back for the, the relevant working groups and the FDA to look at this record? Tell me what, why, why, why I shouldn't, my vote shouldn't be to do that. So with respect to the working group, it does exist and it is an ongoing project. Um, with respect to the omission of any reference to this committee in the order terminating the notice of inquiry, we did formally solicit the views of all expert agencies in the notice of inquiry, um, at J 165, we made very clear that we intended to rely on them. Um, we, we were very interested to hear their views, um, and the views that we received, we took into account. And I think that that's all that's required here. We explained why our conclusions were what they were based on the representations. Is there anything in the record that says that the FDA asked this radio frequency interagency work group to review this and they weighed in or anything in the record that says that the technical standards, et cetera, committee that was created by statute reviewed any of this and weighed it. There's nothing that says that specifically. And pardon me, is the answer. No, the answer is no on that specific question, but I would just point your attention to J 81 87, where the FDA says explicitly, um, they, they acknowledge five G specifically, which goes to judge Millette's questions about the proliferation and ubiquity of personal devices. But they say FDA is responsible for the collection and analysis of scientific information that ray that may relate to the safety of cell phones and other electronic products. So why shouldn't we, as a court reviewing this say that at a minimum FDA should tell FCC and by extension, tell the public and any court reviewing this, that the expert bodies within it that were submitted in response to the notice of inquiry, i.e. if we want to say this, this interagency work group is the, the, the, the right body, or if we want to say that the committee that Congress required the FDA to establish is the right body, but one of them, why shouldn't we at a minimum say before we believe that, that, that the F we can allow kind of any sort of deference to the FCC relying on the FDA, we need to know that the right people at the FDA actually looked at the materials. Well, I think that there's nothing in the statute that suggests that the committee has to speak through the committee. I think that the FDA, um, as the agency charged with keeping abreast of the science in this area can speak to the state of the science. And it does refer to its ongoing monitoring activities and its letter to the FCC at J 81 87. Um, and, and this is extra record material and we're not relying on it for you to uphold the agency's decision, but the FDA did release a review of the scientific evidence in 2020 and its conclusions were consistent with the conclusions that the FCC drew. No, we can't consider that. That's absolutely right. And we're not suggesting that you need to consider it to uphold the agency's decision, but I think it does confirm the centrality of the FDA to this area. It's not just that they, we don't know that they ask their experts. We don't know what they asked them because all we got from the FDA is cell phones and cancer. And we know whether, is it unreasonable for the FCC to take the FDA's representations at face value without verifying that the relevant experts have looked at the questions that the FCC actually asked when they get a report back that only talks about cell cancer. I think it is reasonable for the agency to do so. And I think that's what the court and cellular phone task force said. I mean, in our case, we specifically noted that, um, what could make a difference is if circumstances change, we have that in there and that circumstances could change over time, then there would need to be another look. And that was what you all flagged in your notice of inquiry. Your notice of inquiry was things have changed, including the ubiquity and multiplicity of devices. And then when the FCC gets an answer back, that simply isn't answering those questions. And then as judge Wilkins has pointed out, doesn't even say we consulted the people who are in charge of studying these things. That's just, just seems to be, I'm not, you get a lot of leash, but at some point that leash goes too far and becomes unreasonable without a little bit of follow-up by the FCC to make, to verify, just to pin down that the information is responsive. Well, I hear your concern again about the cumulative effects here, but I think the predicate question to any assessment of the cumulative effects is whether there's any adverse effect at all from, from a single device. And as I said, the only substantiated adverse effects are thermal, which would mean that cumulative effects wouldn't be, wouldn't, substantiated credible scientific evidence as it stands now. And, and how do I know that the, that the radio frequency interagency work group doesn't believe that there are non-thermal effects that should be regulated? How do I know that the committee that Congress told the FDA to create this technical electronic product radiation safety standards committee doesn't believe that there are non-thermal effects that need to be regulated or concerned? I mean, my point is that you're asking me to infer a negative and you, but without there being anything in the record that the agencies, the agency that committee that Congress said should look at this even looked at it. And then you refer to an interagency work group that you say looks at these things, even though there's nothing in the record about that work group or what they looked at or haven't looked at. Again, I think that the, we formally solicited the views of other entities with expertise in this area. We made very clear that we wanted to rely on them. We relied on the views of expert agencies and adopting these limits in the first place and no federal agency or body. Did you solicit these committees or did you just solicit the FDA? We, we, in the, in, at JA 165 of the notice of inquiry, we said, we formally seek the input of all of the, the, the expert bodies in this area. And we, we left the docket open for seven years, giving ample opportunity to weigh in. And not one of these bodies said, you need to change your standards. And, and we don't, we're not arguing that silence should be construed as endorsement, but it shouldn't be construed as disapproval of the, of the agency's existing limits. I think even if you construe it as neutral, all of the representations that we did receive. And again, and again, the FDA has, it's undisputed. You want us to construe it as deliberation, that silence should be construed as, as the, these, these relevance committees actually deliberated, actually reviewed the record in studies. So you are asking us to infer something that's significant. Well, all that we're asking you to infer is what the second circuit and cellular phone task force was reasonable, which was for us to presume that the agencies and bodies charged with staying on top of this area and regulating in this area and paying attention to the science in this area have done so. And, and yes, we're, we're asking that you presume that, that the agencies with responsibility in this area. Even when the report that they send back doesn't reference, you know, lots of relevant studies and lots of relevant issues, we still presume that they reviewed those studies and those issues. Yes. I think it's reasonable for the, for the FCC to presume that they did. As I said, the FDA referred to its ongoing monitoring activities and, and, and confirmed its responsibility in this area. And, and I don't think that there's any requirement that the, that the FCC wait for the, this committee to speak as a committee that it can't rely on the FDA's representations about the state of the science. Again, this, this committee is created and the FDA is, you know, operating statute and, and appears in the section right after FDA has been anointed the agency with responsibility in this area. And, and under the, Tell me whether that committee even exists or whether the committee reviewed anything having to do with this petition. I can't sitting here. I don't, I don't have any personal knowledge about that committee. I do know, as I said, shouldn't that bother bother the court? Well, again, because the FDA weighed in it's statutorily directed to be the responsible agency in this area. And I think the FDA, we know it does have primary jurisdiction over public health. I don't know that every other member of that committee does, but they are certainly well-equipped to evaluate the science and make a representation about the sufficiency of the radio frequency emission limits. I mean, one other point, the FDA regulates in this area. They are responsible for promulgating the radio frequency emission levels for devices that the And, and just as we relied on expert agencies and adopting the limits, it was reasonable to do so here. I just, one more point on this. As I said, at the outset, we weren't writing on a blank slate here in 1996, we adopted these limits and we had the input of the FDA, the EPA, OSHA and IOSH. So these limits don't reflect the views exclusively of the FDA. That it was a considered and, and, and lengthy deliberative rulemaking. And none of them weighed in to say that they needed to be changed. I'd be happy to answer other questions of the panel. I do have one. How difficult would it be to determine whether these committees and working groups exist? I can easily. Well, I mean, are they set up by regulation or, or that's my question. Is it, is it answer, is it a question you can answer with a, some sort of supplemental submission? Yes. It is a factual question. And, and it's certainly one that we can answer in a supplement if the panel is interested. All right. All right. Are there any more questions? None for me. All right. Judge. If there are no further questions, we ask that the petitions for review be denied. All right. Mr. McCullough, why don't you take a couple minutes and reply? Thank you. I'd like to try to make about five or six really quick points. First of all, to follow up from the questioning about Fox, if you could take a look at 780 F third at 1024 to 1047. That's where the court discusses the matter that we were, we were addressing. You might also take a look at the American horse decision that we cited in our brief says that even at the high level of deference, the agency has, I'm sorry, which pages in Fox specifically are you talking about? 1024 to 1047. Wait, I have, sorry. Fox starts on 1027, doesn't it? I'm so sorry. I may have that wrong. I was dealing with a printout, but it is in there and I do apologize. I really do have to push back against the finding in the order in counsel's argument that there's no evidence of non-thermal arts. We don't have to go through it right now, but I would love to direct your attention to when you get back in chambers, the exhibit that we distributed to the court for purposes of oral argument. There are three pictures in there, each of which show non-thermal impacts from radiation, blood-brain barrier damage, DNA damage, and then glucose metabolism responses. All of these are direct responses to and effects from exposure to non-thermal RF. So you just simply cannot say there is no evidence. All of this is in the record. The commission cannot say that there is no evidence when there are 1,000 peer-reviewed studies that show harmful effects from non-thermal. With regard to the agencies, the Interior Department, the EPA, the OSHA, a couple of them did respond to the commission in somewhat cursory fashion. Granted, you know what they said? They said, talk to the NTP. They didn't say talk to the FDA. They said, NTP to be the agency with expertise here. And we know what the NTP found. With regard to the RFIAWG, I cannot presently help you with the factual question you asked. We, too, would be happy to supplement. But I do know that there is evidence in the record indicating the RFIAWG, after 1996, supplied information to the commission expressing significant concerns about the non-thermal-only approach. They, too, had concerns with the thermal-only regime. With regard to Judge Wilkins' questioning about remand, we, of course, that's precisely what we see. We think the commission failed to address the record that was before it. It did not evaluate that information. And we, of course, would very much appreciate the ability to provide even more information, because things happen every day. There have been developments since this order was issued a little over a year ago. We can't look at developments after the record in this case. I understand. And that's why we think that it should be considered on remand. As Judge Millett pointed out, the situation is far different now than in 2000 and 2004. And the science is far more robust. I was fascinated by the questions about cumulative impact and counsel's admission that when it comes to non-fixed sources, its rules do not account for cumulative impact. Response to chronic exposures from any of these, much less mobile devices. And that is because they persist in this thermal-only approach. But the evidence is clear that there are biological responses that are, in many ways, similar to what happens with thermal radiation. It is simply that it is an indirect response rather than a direct response. The same kind of health consequences occur. It just occurs indirectly through mechanisms like oxidative stress. Now, with regard to the contention that the consensus is the same, that is simply not true. Take a look at the chart on the right-hand side of our exhibit. The majority of studies now show that there are harmful thermal effects. Are those charts that you submitted to us, are they part of the record? It is a compilation of information that is in the record. They're not from the record itself? This particular exhibit is not in the record, but each of the squares, each of the images are in the record on the left and bottom side. And then the majority of studies chart comes from graphs that are also in the record we just compiled. The commission insists there's no effect, but that is only because it affects. And that's the very problem here. When you're looking at the testing regime or anything else, yes, of course, you want to have a safety margin. When you're going around an obstacle, you want to give it a wide berth. The problem is the safety margin here. Everybody is so focused on the thermal effect that they're not paying attention to the ditch that you're driving into on the non-thermal effect side. All right. You need to wrap it up, Mr. McCullough. Thank you. I'd be very much remiss if I did not make one final plea. The commission did not at all consider individual impacts for those who demonstrated that they are presently being harmed. It made no provision for them. It did not recognize them. These were individuals who have just had their lives devastated. We respectfully request that the court vacate and remand and require the commission to engage in recent decision-making and respond to all the material points and commentaries. Thank you. All right. Thank you. Ms. Boissel, can you get whatever information there is about the formation of these committees and working groups we've been talking about and submit it to the commission? Well, let's see. That should be fairly easy. It's either there or they either exist or they don't. Let's say by 5 o'clock tomorrow and then Mr. McCullough, let's see. I don't know that there'd be anything to respond to because they either exist or they don't, but why don't you take another 24 hours if you have anything you want to submit in response that is purely factual? Do my colleagues have anything they want to add or request? Can we find out the timing, if possible, when they were created? Not only did they exist, but when they came into existence? Sure. That's a good point. And if you're able to, the membership, who's on these committees? And Judge Wilkins, anything from you? No. About submissions? Okay. No. All right. Then I have one final question for Mr. McCullough that has nothing to do with this case, but you practice law in one of the most colorful sounding towns I've ever heard. Where is Dripping Springs, Texas? Dripping Springs, Texas is about 40 miles west of Austin, Texas. Okay. It is in the hill country and it is a beautiful, beautiful small town. All right. Well, I'm glad I learned of its existence. Thank you. All right. Your case is submitted.
judges: Henderson, Millett, Wilkins